der section 1421(c). *See, e.g., Matter of Cruz,* 15 I & N 236. The INS improperly relied solely on acts outside the statutory period. *See, e.g., Marcantonio v. U.S.,* 185 F.2d 934; *Tan v. U.S. Dept. of Justice, Immigration and Naturalization Service,* 931 F.Supp. 725.

*Findings of Fact*

■ The Court finds that the plaintiff has shown by a preponderance of the evidence that he is of good moral character. The Court also finds that, but for the pendency of the deportation proceedings, Jonathan Gatcliffe is fully qualified for naturalization. The decision of the District Director of the Immigration & Naturalization Service of May 27, 1997, is reversed and the matter is remanded for further proceedings.

**English CARTER, by her father and next friend, Siegfried WARD, et al., Plaintiffs,**

v.

**PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS, et al., Defendants.**

**No. Civ.A. AW–97–3234.**

United States District Court,
D. Maryland,
Southern Division.

Oct. 5, 1998.

**2.** Section 1427(a), "Residence," provides, in part:

No person ... shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time ..., and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached

to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.
8 U.S.C. § 1427(a).

**3.** The mandate of the 1990 amendments to the Immigration and Nationality Act, INA § 101(f)(8), 8 U.S.C. § 110(f)(8), that any person found to have committed an aggravated felony can not be found to be of good moral character applies only to aggravated felonies committed after November 29, 1990. INS General Counsel Opinion 96–16.

Anna Jenefsky, Washington, DC, for Plaintiffs.

Andrew W. Nussbaum, Gail B. Veins, Amy B. Glaser, Reichelt, Nussbaum, LaPlaca & Miller, Upper Marlboro, MD, for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

The parties are before the Court on cross motions for summary judgment pursuant to Fed.R.Civ.P. 56(c). Plaintiffs seek summary judgment, in substance, on the grounds that English Carter was denied a free appropriate public education in contravention of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, and Maryland law. Defendants filed its motion for summary judgment contending that Plaintiff is not "disabled" as defined by the respective statutes, and therefore not an eligible member of their protected classes. Both parties have opposed each other's respective motions for summary judgment. A hearing was held September 28, 1998. Local Rule 105.6 (D.Md.). Upon consideration of the motions, and careful attention given to the arguments in support of and opposition to, and for the reasons stated below, the Court will grant the Defendants' Motion for Summary Judgment, and deny the Plaintiffs' Motion for Summary Judgment.

## I. BACKGROUND

### A. Procedural Background

This litigation concerns the diagnosis of a eight-year-old girl, English Carter ("English"), for a learning disability. English's father, Siegfried Ward, claims that his daughter suffers from a disability that affects her ability to learn and perform academically, and is entitled to a specialized education as provided under the IDEA, the Rehabilitation Act, and Maryland law. However, Defendants, Prince George's County Public Schools ("PGCPS"), contend that English is not disabled, but a slow learner, and not entitled to be treated as such under the law.

Dissatisfied with the Defendants' determination that English was not considered to have a learning disability, Plaintiffs requested an impartial due process hearing before an impartial state administrative hearing officer pursuant to both the IDEA and Maryland statutes. See 20 U.S.C. § 1415(c); Md. Code Ann., Educ. § 8–413 (1996). At the state administrative hearing, the Administrative Law Judge ("ALJ") concluded that the school authorities correctly determined that English did not have a learning disability or any other impairment entitling her to a specialized education under the IDEA or Maryland law. Accordingly, the ALJ affirmed the Defendants' determination. Plaintiffs now appeal the ALJ's decision to this Court pursuant to 20 U.S.C. Section 1415(e)(2). Thus, the ultimate question facing this Court on both parties' cross motions for summary judgment is whether English Carter is "disabled," as defined under the respective statutes, and thus eligible for benefits under them.

### B. Factual Background

English Carter is currently enrolled in the first grade at Thomas Claggett Elementary School in the Prince George's County Public School District in Maryland. English first entered Thomas Claggett during the 1995–1996 school year as a Kindergarten student. In May 1996, at the end of her Kindergarten year, English's teachers noticed she was having extreme difficulty in all of her academic areas. English was then referred for a psychological evaluation to determine if she suffered from a learning disability. She was given the Wechsler Preschool and Primary Scale of Intelligence—Revised test ("WPPSI–R"), which evaluates an individual's cognitive abilities. English's performance on the WPPSI–R established that she had significantly low cognitive functioning. The test results showed that her full scale IQ score was 71, while her Verbal IQ was 73, and Performance IQ was 74. These scores placed English in the borderline range, between very low average cognitive functioning and mild mental retardation. (Admin. Record at p. 6a)

Despite the test results, and her teachers' observations, that established English was not academically ready for first grade, she was still promoted in the 1996–1997 school term. However, in the second trimester of the school term, English was returned to Kindergarten after her teachers noticed she was not learning at the same rate as her first grade peers. Upon her return to Kindergarten, the school's Admission, Review, and Dismissal ("ARD") Committee[1] determined that English should be administered an additional series of tests to assess whether she had an educational disability. English was given a battery of tests measuring her language, vocabulary, speech, reading, and cognitive abilities. The results of the tests showed that English performed at a level well below her chronological age. The results were then presented to the ARD Committee for evaluation to determine whether English suffered

from an educational disability and eligible for special education and related services under the IDEA. The ARD Committee concluded that English was in fact not disabled, but a "slow learner" entitled only to a regular education program.

In the case at bar, Plaintiffs argue that in addition to incorrectly classifying English as not having any learning disabilities or impairments, the Defendants violated a host of their procedural rights under the IDEA and Maryland law. Defendants deny the allegations. Accordingly, the Court will address the substance of both motions for summary judgment below.

## II. DISCUSSION

### A. Standard of Review for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *Runnebaum v. NationsBank of Md., N.A .,* 123 F.3d 156, 164 (4th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985)). To defeat such a motion, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him or her. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an

---

1. The ARD Committee serves with the authority of the local superintendent and receives all referrals of students identified as potentially in need of special education and related services. *See* COMAR, 13A.05.01.08. It consists of individuals familiar with the student's current level of functioning, interdisciplinary personnel from the

public agency and local health department, special educators, and any others deemed appropriate. *Id.* Once a student is identified, the committee then conducts all the necessary evaluations to ascertain the student's educational placement. *Id.*

integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (citations omitted). In determining whether genuine and material factual disputes exist, the Court has reviewed the parties' respective memoranda and the many exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. *The Individuals with Disabilities Education Act*

■ The purpose of the IDEA is to provide federal funding to state and local education agencies to ensure disabled children receive "some form of meaningful education." *In re Conklin v. Anne Arundel County Board,* 946 F.2d 306, 308 (4th Cir.1991). The IDEA entitles disabled children to a "free, appropriate public education" (FAPE). FAPE is defined as "special education and related services that (1) have been provided at public expense, under public supervision and direction, and without charge, (2) meet the standards of the State educational agency, (3) include an appropriate preschool, elementary, or secondary school education in the State involved, and (4) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." 20 U.S.C.A. § 1401(a)(18).

■ However, to be considered a member of the IDEA's protected class, the individual must be classified as having a recognized disability. Section 1401(a)(1) of the IDEA identifies the following as covered disabilities: mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; in addition to those children who, by reason thereof, need special education and related services.[2] Once classified as disabled, a comprehensive statement of the educational needs of the student (commonly referred to as the individualized education program ("IEP")) is developed to identify the appropriate instruction and service necessary to meet those needs. *See Burlington School Committee v. Department of Education of Massachusetts,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

In addition to the educational benefits disabled students receive, the IDEA also affords the parents and/or guardians a panoply of procedural rights. *See Sellers v. School Board of City of Manassas,* 141 F.3d 524 (4th Cir.1998). One such right is that if a parent or guardian is dissatisfied with the "identification, evaluation, or educational placement of the child" by the local school authorities, a due process hearing before an impartial state administrative hearing officer may be requested. 20 U.S.C. § 1415(b)(1)(A) and (b)(2); Md.Code Ann., Educ. § 8–413 (1996). Moreover, any decision made by the administrative hearing officer may then be appealed in federal district court. 20 U.S.C. § 1415(e)(2).

■ Once an IDEA case reaches the federal court, district courts are to employ the standard of review announced by the Supreme Court in *Board of Educ. of the Hendrick Hudson Central School District, Westchester County v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Therein, the Court stated that district courts are to perform the following two-part inquiry: (1) determine whether the State has complied with the IDEA procedural requirements; and (2) ascertain whether the individualized educational program (IEP) was reasonably calculated to enable the child to

2. For children between the ages of three and five years-old, the IDEA recognizes the following additional disabilities:

 children experiencing developmental, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: physical development, cognitive development, commu-

nication development, social or emotional development, or adaptive development; and who, by reason thereof, need special education and related services.

20 U.S.C.A. § 1401(a)(1)(B)(i) and (ii) (West Supp.1998). This section may be relevant as Plaintiffs' action contain allegations regarding English beginning when she was five years old.

receive educational benefits. *Id.* at 206–07, 102 S.Ct. 3034. The Court added that although the district court is to base its decision on the preponderance of the evidence, such is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. 3034.

■ The Fourth Circuit has further elaborated on the *Rowley* Court's standard of review for district courts in IDEA cases. In *Doyle v. Arlington County School Board,* the court held that if the state administrative officer based its decision on findings of fact made in a regular manner and with evidentiary support, then its decisions are "entitled to be considered *prima facie* correct." 953 F.2d 100, 105 (4th Cir.1991). As such, the district court is expected to make a "bounded, independent decision" based upon the administrative record and any additional evidence presented. *Id.* at 103. However, if the district court decides not to follow the administrative fact findings, it must provide adequate basis for doing so. *Id.* at 105. Thus, the district court would "examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed," and then after giving those findings "due weight," it may make its own independent decision based on the preponderance of the evidence. *Id.*

## C. Analysis

■ The crux of the pending matter concerns the identification, evaluation, and educational placement of English by PGCPS. The importance of the local school authorities' decision as to whether the student seeking benefits under the IDEA suffers from a

covered disability is evident. Without an initial determination of being disabled, the student would not be entitled to an IDEA individualized education program, and instead would receive the "regular" education afforded to non-disabled students. Moreover, if the individual is not considered disabled under either the IDEA or Maryland law, then he or she would not be afforded the procedural rights under the laws[3]. Here, Plaintiffs have advanced at least three disabilities that they claim English has. First, at the state administrative hearing, Mr. Ward claimed that English is "learning disabled."[4] Second, in their motion for summary judgment, Plaintiffs asserted that English is mildly mentally retarded. Third, during the hearing, counsel for Plaintiffs argued that English is speech and language impaired.

■ The difficulty with Plaintiffs' multifarious positions is that each proffered disability has its own distinct legal definition that must be met. In order to be classified as "learning disabled" under IDEA[5], a child must be unable to achieve commensurate with his or her age ability levels, and show a severe discrepancy between achievement and intellectual ability in one or more of the following areas: (1) oral expression; (2) listening comprehension; (3) written expression; (4) basic reading skill; (5) reading comprehension; (6) mathematics calculation; or (7) mathematics reasoning. *See* 34 C.F.R. § 300.541. To be considered "mentally retarded" the child must exhibit "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period that adversely affects a child's educational performance." 34 C.F.R. § 300.7. Finally,

---

**3.** Plaintiffs also brought suit under § 794 of the Rehabilitation Act. However, unlike the IDEA and the applicable Maryland statute, § 794 does not provide rights and entitlements, but rather proscribes certain discriminatory acts against handicapped individuals. Thus, Plaintiffs cannot proceed under both statutes based on a denial of a free appropriate public education, especially if the individual is not proven to even have a disability. *See Doe by Gonzales v. Maher,* 793 F.2d 1470 (9th Cir.1986), *cert. granted in part* 479 U.S. 1084, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987), *affirmed as modified* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Georgia Ass'n of Retarded*

*Citizens v. McDaniel,* 740 F.2d 902 (11th Cir. 1984), *cert. denied* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985).

**4.** Although the PGCPS specifically addressed Mr. Ward's allegation that English was "learning disabled" at the hearing, the Court is convinced that Mr. Ward, who was unrepresented by counsel then, was using the term "learning disabled" in its most general sense.

**5.** Maryland applies the same criteria, verbatim, as that of the IDEA. *See* COMAR, 13A.05.01.05.

the law recognizes a speech and language impairment as "a communication disorder such as stuttering, impaired articulation, a language impairment, or a voice impairment that adversely affects a child's educational performance." *Id.*

■ Since counsel for the Plaintiffs conceded at the hearing that English does not meet the legal definition of learning disabled, the Court will only consider whether English is mentally retarded or speech and language impaired. Moreover, under the IDEA and Maryland law, an individual cannot be considered both "learning disabled" or "speech and language impaired" and "mentally retarded." [6] As such, Plaintiffs' contention is that the ARD Committee misclassified English as a "slow learner," rather than "mentally retarded," or in the alternative, "speech and language impaired."

### 1. Mental Retardation

As for English being mentally retarded, Plaintiffs claim that the results of the tests performed on her suggest that she is mildly mentally retarded. In their motion, Plaintiffs rely on the results of two evaluations. One was conducted by PGCPS, and the other by a group of professionals from the Kingsbury Center in Washington, D.C. that Plaintiffs independently sought.

The PGCPS Evaluation consisted of a battery of tests that English took when she was six years old. Those tests included, the Woodcock–Johnson Revised (tests reading, math, and general knowledge), the Kindergarten–First Grade (K–1) Reading Readiness (tests arithmetic, reading, and spelling), four language tests (tests phonetic, receptive vocabulary, expressive vocabulary, and a general language), and the Wechsler Intelligence Scale for Children (tests cognitive abilities—I.Q. tests). From what can be gleaned from the exhibits and transcripts of the administrative hearing below, English scored: (a) one to two years below her age equivalent on the Woodcock–Johnson Revised test; (b) two to three years below her age equivalent on the K–1 Reading Readiness test; (c) approximately one to one and a half years below her age equivalent on the four language tests; (d) in the "low 70s" (average range is 85–115) on the cognitive component of the Wechsler Intelligence Scale for Children; and (e) significantly below average or a score of 3 (7–13 is the average range) on the comprehension component of the Wechsler Intelligence Scale for Children. The overall results of these tests indicate that English is functioning significantly below that of her chronological age. Although neither party questions the empirical results or methodology of the tests performed by PGCPS, they do disagree as to how they should be interpreted.

Plaintiffs assert that the significantly low scores on the tests, particularly English's cognitive I.Q. score in the low 70s, suggest she is mildly mentally retarded. Plaintiffs cite the testimony of Denise Frank–Conneen, the school psychologist, who performed the Wechsler Intelligence Scale for Children, as a basis for their claim. At the administrative hearing, Ms. Conneen testified that a cognitive I.Q. score in the low 70s generally falls within the range of "mental retardation," while a score of three on the comprehensive component is "severely deficient." (Admin. Transcripts at p. 33–34.) Plaintiffs bolster their assertion with the results of the independent evaluation they had performed by the Kingsbury Center ("Kingsbury") in August of 1997 when English was almost seven years old.[7]

Kingsbury also conducted a comprehensive psychoeducational evaluation of English, which included the Wechsler Intelligence Scale for Children, the Woodcock–Johnson

---

**6.** The statute provides that, "The team [Admission, Review, and Dismissal Committee] may not identify a student as having a specific learning disability if the severe discrepancy between ability and achievement is primarily the result of . . . Mental retardation." 34 C.F.R. § 300.541(b); COMAR 13A.05.01.05(2)(b). Thus, English can only be considered either mentally retarded or speech and language impaired.

**7.** In their motion and at the hearing, Defendants objected to the Plaintiffs' use of and reliance on the Kingsbury Evaluation because it was not presented below at the administrative hearing. However, with regard to IDEA cases, in reviewing state administrative findings, the Fourth Circuit makes clear that the district court may consider not only the administrative record, but any "additional evidence" presented. *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 981 (4th Cir.1990) (citation omitted).

test, various achievement, language, visual-motor, and psychological tests. Kingsbury concluded that English's overall intellectual functioning fell in the "upper end of the Mild Mental Retardation range ... significantly subaverage compared to other children her age," and her "cognitive, adaptive, and emotional functioning ... are more like a four year old than an almost seven year old." (Kingsbury Evaluation, Plaintiffs' Exhibit D, p. 13–14.)

PGCPS, on the other hand, assert that the results of the tests performed by them suggest English is not mentally retarded, but a "slow learner." PGCPS claim that in order to be considered mentally retarded, the child's cumulative scores in each of the various areas tested must be "significantly subaverage." PGCPS claim that English's scores cumulatively do not fall in the mental retardation range. Instead, Defendants assert that although English's cognitive and academic scores are well below average, she has tested above the mental retardation level in other areas. This, PGCPS concluded, suggests that English is a slow learner, and simply is performing up to her abilities, which is that of a child with below average abilities.

As previously mentioned, the IDEA and Maryland law define mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period that adversely affects a child's educational performance." 34 C.F.R. § 300.7. As Defendants have argued, the definition requires the child to score significantly below average in "general intellectual functioning." Although "general intellectual functioning" is defined by one's intelligent quotient (IQ) obtained by the type of tests perform on English, experts caution that "when there is a significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 40 (4th ed.1994).

Here, English's scores, viewed in total, on both the PGCPS and the Kingsbury Evaluations do not appear consistent with Plaintiffs' claim that she is mentally retarded. First, on the PGCPS and Kingsbury Evaluations, respectively, English's IQ scores were, 70 and 74 on the verbal subtest, 73 and 73 on the performance subtest, and 71 and 69 for the full scale. While these scores suggest that English definitely has some learning deficiencies, most of the scores hover above the high end of the Mild Mental Retardation range.[8] Second, English scored out of the mental retardation range, albeit still below her age level average, in other various skill areas. On the PGCPS Evaluation, English achieved an 85 and 86 on the receptive language and expressive language tests, respectively, and demonstrated a relative strength in long-term visual memory. On the Kingsbury Evaluation, English's performance on the component tests of the Woodcock Johnson—Revised Skills Cluster ranged from a low of 66 in Humanities to 90 in Science, and she equally demonstrated a relative strength in both long term retrieval and short term auditory memory. Third, English's teachers have reported that she has shown some academic progress, especially since she was assigned to a new classroom. As her principal testified at the administrative hearing, English has been placed in a cooperative learning group, which consists of approximately 6–7 children with varied abilities. The children in the cooperative learning group are clustered according to their abilities, from the talented and gifted students to slow learners, in an effort to facilitate a mutual learning environment amongst the students. The school claims that this small cooperative group setting has been more conducive in meeting English's academic needs.

Although younger children with Mild Mental Retardation are "often not distinguishable from children without mental retardation until a later age," the Court is not convinced that English Carter is mentally retarded. *Diagnostic and Statistical Manual of Mental Disorders* at 40. Viewing the all evi-

---

8. The range for Mild Mental Retardation is an IQ level between 50–55 to approximately 70. *Diag-* *nostic and Statistical Manual of Mental Disorders* at 40.

dence, and giving due weight to the state administrative proceedings, there appears to be no genuine dispute as to any material facts that would allow Plaintiffs to survive summary judgment. However, the Court encourages both the parents and the school authorities to continue to closely monitor English for any progress or any indications of a disability.

## 2. Speech and Language Impaired

Plaintiffs also assert that English is speech and language impaired. In fact, at the hearing, Plaintiffs' counsel claimed that English being speech and language impaired is their primary contention, and mental retardation is secondary. Regardless, Plaintiffs must prove that English has "a communication disorder such as stuttering, impaired articulation, a language impairment, or a voice impairment that adversely affects" her educational performance. 34 C.F.R. § 300.7.

 As proof of the disability, Plaintiffs rely solely upon ARD Committee Summary Notices that they claim establishes that English is speech and language impaired. Plaintiffs assert that PGCPS had previously diagnosed English as speech and language impaired in 1996, but later changed their determination. Plaintiffs point to several ARD notices found in the administrative record. However, Plaintiffs' reliance is misplaced. At best, the ARD notices indicate that English's teachers were evaluating her to determine if she needed speech therapy. Moreover, the Court found no definitive statement that English was speech and language impaired anywhere in the record. In fact, there were several instances in the record that PGCPS explicitly stated that English was not learning disabled. Even Plaintiffs' own independent evaluation, the

Kingsbury Evaluation, did not conclude that English may be speech and language impaired. Plaintiffs cannot rest solely on mere unsupported allegations for something as important as whether this child has a learning disability. As such, the Court is not convinced that Plaintiffs have put forth enough evidence to prove that English is speech and language impaired to survive summary judgment on this claim.

## 3. Procedural Violations

Finally, the Complaint alleges that PGCPS violated a number of the Plaintiffs' procedural rights under the IDEA and Maryland law. In particular, Plaintiffs claim that English was denied a free appropriate education because the Defendants failed to notify English's parents of its decision not to classify her as disabled [9], to evaluate her within the proscribed time frame [10], and to provide her with a specialized education [11]. However, the Court need not reach the merits of these claims since it has concluded that Plaintiffs' have not shown that English has a covered disability. Each of the procedural regulations Plaintiffs claim were breached apply to parents of a *disabled child* before a determination is made by the school authorities. PGCPS have always maintained, since English enrolled in Kindergarten, that she was only a slow learner. Since English was never declared disabled by the ARD Committee, PGCPS cannot be held to have committed those procedural violations.

A separate Order consistent with this Opinion will follow.

### ORDER

In accordance with the Memorandum Opinion, it is this 5th day of October, 1998 by

---

9. The regulations require that written notice "must be given to the parents of a *child with a disability* a reasonable time before the public agency ... (1) proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child." 34 C.F.R. § 300.504(a)(1) (emphasis added). In addition, the regulations require the school authorities to inform the parent(s) fully of their procedural rights and disclose all relevant information gathered during the evaluation. 34 C.F.R. § 300.505.

10. Under Maryland law, the ARD Committee is to complete their assessment of the student with-

in 45 days of the referral, and develop an individualized education program within 30 days of "the determination of the student's eligibility for special education and related services." COMAR 13A.05.01.08(E)(1)(b) and (E)(2)(a).

11. Specifically, Plaintiffs claim that English was entitled to receive Extended School Year Services under Maryland law and speech/language services pursuant to the IDEA. However, absent a determination that she is disabled, English would not qualify for such benefits.

the United States District Court for the District of Maryland, ORDERED:

1. That the Defendants' Motion for Summary Judgment [11–1] BE, and the same hereby IS, GRANTED;

2. That the Plaintiffs' Motion for Summary Judgment [12–1] BE, and the same hereby IS, DENIED;

3. That the Clerk of the Court CLOSE this case.

4. That the Clerk of the Court mail copies of this Memorandum Opinion and Order to all counsel of record.